IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 10-cv-00047-MSK

**CHEVRON CORPORATION**, a Delaware corporation,

    Petitioner,

v.

**STRATUS CONSULTING, INC.**, et al.,

    Respondents.

## DECLARATION OF PABLO FAJARDO MENDOZA

I, PABLO FAJARDO MENDOZA, hereby declare as follows:

    1.    I am an attorney residing in Lago Agrio, Ecuador, and am the lead counsel for Plaintiffs in the lawsuit filed against Chevron Corporation ("Chevron") in Lago Agrio, Ecuador (the "Lago Agrio Litigation"). I am licensed to practice law in the Republic of Ecuador and have been so licensed since 2004. I am over the age of 21 and under no disability.

    2.    I understand that in this Court, petitioner Chevron seeks discovery from one of Plaintiffs' non-testifying consultant experts located in the United States, purportedly to be used in furtherance of Chevron's ongoing attack on the credibility of the Expert Report prepared by Ecuadorian court-appointed expert Richard Cabrera Vega ("Mr. Cabrera") in connection with the Lago Agrio Litigation.

    3.    As the Plaintiffs' lead counsel in Ecuador, I offer the facts contained herein to provide this Court with: (1) Relevant context as to the appointment of experts in the Lago Agrio Litigation, in general; (2) Facts surrounding the appointment of Mr. Cabrera, specifically; and (3) Facts pertaining to Mr. Cabrera's gathering of information germane to his report, and the confidentiality of that information.

4. The Lago Agrio litigation has required extensive use of experts to assess both oil contamination at individual sites in the Ecuadorian Amazon, and more general evidentiary and thematic issues. The use of these experts can broadly be described in two phases: experts who conduct sampling and analysis at specific oil production sites, and thematic issue experts.

5. Pursuant to a series of agreements and understandings entered into early in the Lago Agrio litigation, the parties agreed upon a system whereby each would be entitled to select (and pay for) its own expert to write reports on contamination at former Texaco well sites and oil production facilities inspected by the court. Each of these experts, though selected by the parties, was appointed by the court consistent with Ecuadorian procedural rules. Technically, these individuals were considered court-appointed experts even though they worked closely with the parties. The costs for each party's expert were borne by that party. In addition, there was a process whereby a third expert might be appointed by the court to resolve disputes between the party-affiliated experts for each of the judicial inspections.

6. During the fact discovery phase of the litigation, the parties inspected 55 different sites in the Ecuadorian Amazon; Chevron had conducted operations at 53 of these sites. At each of these sites, the parties were represented by their own experts who took soil and/or water samples and prepared reports based largely on the analytical results of those samples together with a larger site analysis. Together, the parties' experts prepared approximately 88 expert reports based on the site inspections.

7. In addition to these experts, over the course of the litigation, the Lago Agrio Court also appointed several experts to carry out a number of studies on particular subjects requested by a party. If the parties could agree on an appropriate person to serve in this capacity, the court was obligated to select that person; absent such an agreement, the court would simply

pg 3 of 7

choose someone it deemed appropriate. Consistent with Ecuadorian law, the fees and costs associated with these experts were ordinarily split evenly between the parties if both parties requested a particular study. If one party requested the study, that party was obligated to pay 100% of the fees and costs associated with the study.

8.   In October 2003, Plaintiffs petitioned the Lago Agrio Court for the eventual appointment of one or more experts specifically for the purposes of conducting a global damages assessment. Chevron, however, failed to request the appointment of a global expert within the time period allotted by Ecuadorian law to make such a request. At the time, Plaintiffs did not nominate any specific individual for this role, proposing only that, for the sake of efficiency, this person or persons should be chosen from among the many experts who would already have worked in the judicial inspections phase when the time arrived for the damages assessment.

9.   While Plaintiffs elected to nominate a global damages assessment expert in 2003, the process to choose that expert began four years later, in 2007. By 2007, however, Chevron changed its mind and tried to nominate a global damages assessment expert out of time. Because Chevron failed to make its request at the proper time, and absent an agreement between the parties, the court determined by law that there would be only a single, court-appointed global damages assessment expert.

10.   Consistent with the process by which experts had previously been appointed in the case, the parties attempted to reach an agreement on the identity of the global damages assessment expert. Chevron proposed John Connor, an American consultant whose company has, to date, been paid approximately five million dollars for his work on behalf of Chevron with respect to the Lago Agrio litigation. Plaintiffs also proposed one of its own experts for the role of global damages assessment expert.

11. The parties ultimately could not reach an agreement, and the court concluded that the global damages assessment expert would be selected from the pool of seven independent experts it previously appointed in the case. Of the seven, the court appointed Richard Cabrera Vega who, in November 2006, had been appointed by the court and served as an expert for three judicial site inspections.

12. Notwithstanding Mr. Cabrera's status as a court-appointed expert, Plaintiffs were ordered to pay Mr. Cabrera's fees in their entirety due to the fact that Chevron had not, in 2003, requested the appointment of an expert on this issue.

13. Mr. Cabrera was officially named as the global damages assessment expert in March 2007, and, after some delay resulting from Chevron's objections to Mr. Cabrera's work, commenced his duties in June 2007. Mr. Cabrera performed no less than forty-eight (48) separate site inspections on his own, in constant communication with the court.

14. Mr. Cabrera proceeded in his work on notice to both parties. Prior to any site inspection, Mr. Cabrera would write a letter to the court describing the date and location of that inspection; the parties would receive a copy of the letter and could attend the inspection if they so chose. Chevron actively participated in the process of Mr. Cabrera's field work. At the inspections and otherwise, Chevron attempted to impede Mr. Cabrera at every turn, harassing him and injecting delay into the proceedings. For example, Chevron challenged the sampling locations selected and other aspects of his work plan; disputed the veracity of lab results from samples taken by Mr. Cabrera, and forced Mr. Cabrera to be subjected to a "blind study" by an independent laboratory, causing significant delay. Contrary to court orders, Chevron disturbed the areas where Cabrera was scheduled to perform testing (i.e., rolling in with machines that would compromise the ground to be sampled, interfering with Mr. Cabrera's ability to sample

4

there). Chevron also filed multiple motions attacking Mr. Cabrera's qualifications, credibility, processes, and findings.

15. On November 6, 2007, Mr. Cabrera filed an official complaint with the Lago Agrio Court claiming that members of Chevron's legal team in Ecuador subjected him to threats and insults when he would conduct his field work. In the complaint, Mr. Cabrera asserted that unknown persons were following him and members of his technical team in Lago Agrio, the town that he used as a base for his work in inspecting sites in nearby oil fields. As a result of this complaint, the Lago Agrio Court mandated that Mr. Cabrera and members of his technical sampling team would be given law enforcement protection when conducting field work.

16. In addition to the information collected from the vast amount of field inspections he performed, Mr. Cabrera was also free to consider materials submitted to him by the parties. Both Plaintiffs and Chevron were asked to supply Mr. Cabrera with documents.

17. On two occasions, Mr. Cabrera requested that the court order that Chevron cooperate with him and turn over to him any information that they wanted consistent with his mandate. The dates of these official requests as issued by the court to Chevron at Mr. Cabrera's request were August 17, 2007 and January 7, 2008. The second of these requests was directed to the plaintiffs as well. Further, on January 30, 2008, the court issued another order requesting that both parties turn over any information that they thought would be useful to Mr. Cabrera.

18. Plaintiffs delivered materials to Mr. Cabrera. The court did not retain a copy of the materials, opining that the materials would not be considered as evidence in the case, separate and apart from Cabrera's use of them in his report.

19. In submitting these materials to Mr. Cabrera, my personal understanding was that they would be reviewed by Mr. Cabrera alone and that neither Chevron nor its counsel would be

entitled to receive a copy of same. Obviously, to the extent that Mr. Cabrera put into his report any of the information that I supplied to him, it would be viewable by Chevron or any other member of the public that reviewed Mr. Cabrera's report. However, I had no expectation that Chevron or anyone else would be entitled to see the actual documents and/or information that I provided to Mr. Cabrera, separate and apart from its appearance in his report.

20. Nonetheless, on February 27, 2008, Chevron petitioned the court seeking a copy of all materials submitted by Plaintiffs to Mr. Cabrera. The court rejected Chevron's request. Chevron also objected to Mr. Cabrera's consideration of Plaintiffs' materials. Again, the court rejected Chevron's request and reiterated the propriety of Plaintiffs' submission of materials to Mr. Cabrera.

21. Throughout the process, by virtue of Cabrera's status as a court-appointed expert, Chevron enjoyed the same opportunity as Plaintiffs to provide materials to Cabrera supportive of its position in the litigation. Indeed, Mr. Cabrera actively sought documents from Chevron, including environmental audits prepared by Chevron's own consultants. But Chevron chose to forego this opportunity, and refused to partake in the process.

22. Chevron rebuffed Mr. Cabrera's first request for documents, offering the formalistic justification that Mr. Cabrera's request was improperly addressed to the legal representatives of "Chevron Corporation," and should have been addressed to "Texaco Company." Chevron has offered no substantive reason for its refusal to cooperate with Mr. Cabrera.

23. Chevron had many opportunities to question the substance of Mr. Cabrera's work. In fact, throughout the process, Mr. Cabrera responded to no less than ten (10) sets of interrogatories and complaints propounded by Chevron.

6

24. Chevron has also petitioned the court to have Mr. Cabrera deposed, an atypical measure under Ecuadorian law and practice. Instead, Mr. Cabrera was compelled to answer Chevron's questions in writing.

25. After Mr. Cabrera issued his Report, Chevron propounded questions to Mr. Cabrera regarding the substance of the Report during the 100-day comment period granted to the parties by the court. Within this comment period, Chevron made an approximately 1000-page submission to Mr. Cabrera. In accordance with the law, Mr. Cabrera has responded substantively and in great detail to each party submission.

26. To my knowledge, Mr. Cabrera has never indicated that he is unable to fully address the substance of any question posed to him concerning his Report for lack of understanding or familiarity. And although Chevron obviously disagrees with some or all of Mr. Cabrera's responses, Chevron has never asserted in Ecuador that Mr. Cabrera cannot speak to the substance of his Report.

27. Under Ecuadorian law, the court must defer ruling on any objections to Mr. Cabrera's Report – including whether his responses to the parties' questions were satisfactory – *to the time of judgment*, and not sooner.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

Executed on May 5, 2010.

_____
PABLO FAJARDO MENDOZA